CONSOLIDATED WATER POWER & PAPER CO. et al. v. KIMBERLY–CLARK CORP. (two cases).

Civ. A. Nos. 4373, 4782.

United States District Court
E. D. Wisconsin.

Oct. 13, 1952.

778

Charles J. Merriam and William J. Stellman (of Schroeder, Merriam, Hofgren & Brady), Chicago, Ill., Lee J. Gary, Chicago, Ill., V. A. Swanson (of Fairchild, Foley & Sammond), Milwaukee, Wis., T. W. Brazeau, Wisconsin Rapids, Wis., F. Harold Murtfeldt, Chicago, Ill., of counsel, for plaintiffs.

Louis Quarles, Milwaukee, Wis., Cyril A. Soans and William E. Anderson, Chicago, Ill., for defendant.

TEHAN, District Judge.

This is a consolidation of two separate actions brought by the plaintiffs alleging infringement of a process patent, United States Letters Patent No. 1,921,368, issued on August 8, 1933 and relating to a process of coating paper. The coated paper produced by plaintiff and defendant by use of processes claimed by plaintiffs to be covered by the patent in suit is the kind used by popular magazines such as *Life* and *Look*. Infringement of Patent No. 1,921,369 was also alleged in one of the suits originally, but by stipulation the two actions were consolidated and Patent No. 1,921,369 was withdrawn.

Plaintiffs seek injunctive relief and an accounting and damages. Since the patent expired during the pendency of the suit, the question of injunctive relief need no longer be considered and the only matter to be determined is whether or not an accounting should be ordered.

Plaintiffs allege that their coating process invention was one of the greatest advances in the paper-making industry in that it taught an economical and efficient method of applying a mineral surface on a web of paper as it moved through a paper-making machine and thereby so reduced the cost of making paper for use in fine half-tone printing that it revolutionized both the paper-making and the printing industries. Defendant alleges that the patent taught nothing which was new or useful to the paper-making industry.

Untreated paper is a web of interlaced wood fibers which by reason of its uneven surface and its inability to properly receive or hold ink is unsuitable for quality printing and particularly for fine half-tone pictorial illustrations. A clay or

similar mineral surface, however, receives and holds ink well and provides the smooth even surface necessary for fine printing.

The value of a mineral surface for printing was recognized for many decades prior to the date of the patent in suit, and paper coaters had worked out various formulae for obtaining such mineral surfaces. The commonly used methods involved the two operations of applying coating to the paper and then, after application, smoothing the applied coating by means of brushes. The brush coatings were applied to the paper in numerous ways, and might be brushed on, applied by felts carrying the coating, or by rolls dipping into the coating solution, or they might be spattered on by spatter brushes. After application, the coating had to be smoothed by brushes, usually a series of brushes increasing in fineness and softness as the paper progressed.

It was necessary that the amount of water in the coating composition be sufficient so that the removal of water by absorption into the paper would not cause the coating to set up or become immobile before the brushing operation was complete. The amount of water required to accomplish this was such that without the brushing operation, the paper would be detrimentally streaked. In addition, the amount of water used was so great that the paper, even after brushing, could not be brought into contact with heated dryers of the type used in paper manufacturing, and brush coated papers were usually dried by "festooning." Festooning consists of suspending the paper in loops about eight feet high from thin rollers spaced close together on racks so that the paper hangs in festoons between them. Festooning took up much space and greatly limited the speed of operation, since the faster the operation, the greater the length of festoon required.

Brush coating produced beautiful paper but it was slow and costly and could not be operated on the paper-making machine, partly because of the great difference in speed between the two operations, and the space necessary for festooning. In addition, paper making must be done continuously since the starting up of a paper machine is a difficult operation, and brush coating operations were somewhat temperamental. Because of lumps, hairs, brush marks and pole marks from the festooning rods, brush-coated paper usually had to be cut into sheets and each sheet inspected. The cost of inspection and high percentage of rejections added to the cost, and since little of it was available in rolls, it was largely used in sheet-fed presses rather than the high speed rotary presses which are normally roll fed and utilized where a large volume of work is to be done.

The first idea of Massey, the patentee and one of the plaintiffs herein, to produce coated paper was to use a conventional offset press ink distributing system comprising an ink fountain and a multiplicity of transfer and oscillating rolls. In answer to defendant's interrogatories he stated that he reduced his invention to practice in March 1930. This was done not on a paper machine, but on a commercial Miehle offset printing press of the Columbian Engraving Company in Chicago, Illinois. In order to coat the entire surface of the paper, it was necessary to put in a blank plate instead of an ordinary printing plate. The water rolls and three top rolls were then disconnected so that there were left in the roll system, in addition to the applicator rolls, a nest of 17 rolls over which the coating mixture was transferred before it was applied to the applicator roll.

In May, 1930, the application was filed upon which Patent No. 1,921,368 was eventually issued, this being a continuation of an application, Serial No. 450,614, which was filed in the United States Patent Office earlier that month.

The patent in suit was issued on August 8, 1933. The specification of the Massey patent in suit describes the use of a multiple roller structure similar to that used in a printing press. In the patent, Massey discloses, for each side of the paper web to be coated, a roll arrangement, having in addition to the applicator roll, 13 other rolls. In other respects the roll arrangement is substantially identical with that disclosed in the Miehle press drawing (Exh. U–3). The specification says that this multiple

roller structure preworks the coating mixture and thereby accomplishes:

(a) A substantial elimination of fluid so as to reduce it to a plastic state, requiring no further substantial elimination of fluid.

(b) The production of a smooth, uniform concentrated film on the applicator roll before application of the film to the paper.

One or both of these features is set forth in each of the claims in suit, and the file wrapper shows that Massey emphasized these points during the prosecution of the patent.

The first coater built to carry out the process of the patent is shown by Defendant's Exhibit 6, and was installed on the No. 9 paper machine at the Bryant Paper Company in Kalamazoo, Michigan, in the fall of 1932. The coating composition had a solids content of approximately 52%. Paper coated on the original coater at Bryant was printed upon and sold for fine half-tone printing. This machine cost $150,000 and followed closely the original printing press idea, employing a roll arrangement and an ink fountain not greatly different from those disclosed on the Columbian Miehle press and in the patent in suit. The Bryant coater, in addition to the applicator rolls, employed 11 rolls between the ink fountain and the applicator roll.

Meanwhile, in 1932 the defendant company commenced to use, and is still using a process known as the G–K process employing a pair of applicator rolls without the use of brushes, similar to the process described in the Traquair Patent No. 1,-518,371, and within a period of about two years had installed it on their machines, Kimberly 1, 2, 3, 4 and 5, and Quinnesec 1 and 2. Plaintiffs have not charged that this G–K process infringes the patent in suit. Defendant continued to use the G–K process without notable change until the year 1940.

In the late fall of 1933, the Massey coater was demonstrated to Consolidated. It was installed on the No. 4 paper machine at Wisconsin Rapids, and its operation was substantially the same as its operation at Bryant. At this time the operation included, in addition to the applicator rolls, 12 rolls on one side of the paper and 11 rolls on the other, the coating being applied to both sides of the web simultaneously. The coating rolls were not as wide as the paper machine, however, their width being 120 inches as compared to 144 inches for the paper machine. After a short period of two to four weeks of experimental operation, a new coater was ordered to fit the width of the No. 4 machine.

This second coater which was installed on the No. 4 machine in the early fall of 1934 was a new design and had, in addition to the applicator rolls, only 8 rolls on the one side of the paper and 7 rolls on the other.

In addition there was a cleaning roll adjacent to and on the opposite side of the applicator rolls. Massey in his first deposition stated that improvements were made in this 1934 machine of Consolidated in accordance with five later patents, namely: 2,081,945, 2,105,488, 2,105,981, 2,105,982, and 2,106,104. Also, there was issued another patent, No. 2,216,143, directed specifically to a so-called M.G. or Yankee machine operation (Thiele deposition, pages 39–41) which the court inspected at Stevens Point. Defendant has not been charged with infringement of any of these patents.

Following the Wisconsin Rapids No. 4 machine installation, similar installations were made by Consolidated in June, 1936 on Wisconsin Rapids No. 2 machine, and in October, 1937 on Biron No. 3 machine. Meanwhile, Consolidated's sales of coated book paper increased as follows:

| 1933 | None |
|------|------|
| 1934 | 101 tons |
| 1935 | 4,900 tons |
| 1936 | 12,907 tons |
| 1937 | 27,257 tons |

In February 1938 an entire new paper machine had been built, Wisconsin Rapids No. 5. The coater on this machine was of a new design and differed from the original three machines, in that the cleaning roll and 3 transfer rolls were removed. There then remained, in addition to the applicator rolls, only 5 transfer rolls on the one side

of the paper and 4 transfer rolls on the other.

Subsequently, all of Consolidated's machines were changed to this more simple roll arrangement. Coaters similar to the Wisconsin Rapids No. 5 machine were installed on Biron No. 1 in November, 1939; on Wisconsin Rapids No. 1 in March, 1940; on Whiting No. 1 in September, 1946; on Whiting No. 2 in November, 1946; and a new paper-making machine was started in October, 1947, the No. 4 Biron. About 1940, the first three coaters, Wisconsin Rapids No. 4 and No. 2 and Biron No. 3, were also changed to the roll arrangement used first on Wisconsin Rapids machine No. 5 in February, 1938.

The first license granted under any of the Consolidated patents mentioned herein was to the Dunn Sulphite Company, which manufactures coated waxing paper with an arrangement similar to Consolidated's Yankee machine operation at Stevens Point. This license was granted to Dunn Sulphite on September 3, 1938 under two of the patents in the group of five mentioned earlier, and under the application which resulted in Patent 2,216,143. The patent in suit was not included in the license. On October 11, 1939, Consolidated granted a license to Crown-Zellerbach Corporation to make coated opaque waxing paper. Although this license did include the patent in suit, as well as the patents in the Dunn Sulphite license, the royalty fee was the same as that charged Dunn Sulphite.

Furthermore, in this instance and in instances of other licenses where the patent in suit was included, although the licensee had no right to terminate his license without penalty until long after the expiration of the patent in suit, he was compelled after such expiration to pay exactly the same royalty as he paid during the life of the patent in suit.

The G–K process which defendant began using in 1932 consists of a pair of squeeze rolls, through which the paper passes with a pool or bead of coating mixture in the application nip. The coating mixture is supplied from a trough or ductor adjacent to the applicator roll with no oscillating or transfer rolls in between.

In the year 1940, defendant added to one of its G-K coaters a metering roll, a device for controlling the volume of the coating substance applied to an applicator roll. The solids content of the coating mixture was adjusted to give the various coat weights desired. Plaintiffs charge that in so doing, defendant brought itself within the scope of the patent in suit.

In that year of 1940 the plans of the defendant were made known in an article in the Paper Trade Journal, Volume 10, No. 1, issued January 4, 1940, page 13, entitled "Kimberly-Clark to Spend Millions on Plant". In one of the paragraphs entitled "Modernization of Mill at Kimberly", the following appeared:

"The No. 4 paper machine will be torn down completely during 1940, and rebuilt to make an improved type of direct coated paper."

Consolidated's plant manager, Dickerman, saw the article when it appeared.

Advertisements by Kimberly-Clark that their papers were "new formula coated paper" appeared as early as January, 1941. Dickerman's attention was directed to the ads, and he got reports on this new paper from the servicemen and salesmen. Thus, Consolidated had knowledge in January, 1940 that Kimberly-Clark was going to make "an improved type of direct coated paper"; by December 6, 1940, Kimberly-Clark was making this new coated paper. In January, 1941, Kimberly-Clark embarked on an advertising campaign featuring the "new line of coated papers."

Consolidated obtained samples of the new Kimberly-Clark papers and had analyses made. Report 1132, dated December 6, 1940, and Report 1157, dated December 12, 1940, each gave an analysis of the new coated paper.

The accused coating equipment was installed on Kimberly machine No. 4 in 1940, as an incident to a complete rebuilding of that machine, at a cost of about $111,000. At the end of 1942, the metering control was added to defendant's Quinnesec machine

No. 2 at a cost of $80,000; in 1945 and 1946 similar changes were made in Kimberly Nos. 1, 2, and 3 machines at approximately the same expense per machine. Between 1940 and 1946 the defendant made large tonnages of coated paper on these machines which are now alleged to infringe the patent in suit. On May 9, 1946, the plaintiffs sent a notice of infringement to the defendant.

The patent in suit is a process patent for making coated paper. The United States Supreme Court has defined "process" as follows:

"* * * A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. * * * The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence." Cochrane v. Deener, 4 Otto 780, 788, 94 U.S. 780, 788, 24 L.Ed. 139.

The plaintiffs claim that defendant is infringing seven of the claims of the patent, Claims Nos. 1, 2, 3, 5, 6, 7, and 8, which charge is denied by the defendant. The defendant's answer sets up the usual defenses in such an action: (1) denying that the plaintiffs' patent is infringed by defendant's activities, and (2) alleging that plaintiffs' patent is invalid. We will consider first the defense that the claims of the patent in suit cannot be construed broadly enough to include any of the defendant's operations. The claims in question are as follows:

"1. A continuous progressive method of producing a uniformly coated fibrous sheet suitable for printing purposes, which comprises the following steps: forming a continuous wet fibrous web, drying said web under elevated temperature, bringing said web into contact with moving surfaces carrying a uniformly distributed film of coating material, simultaneously transferring said material as a pre-worked smooth finished coating to opposed sides of the web under pressure and drying said coated web, said pre-worked film being of rel-

atively concentrated condition whereby it will not detrimentally affect the fibrous web.

"2. A continuous progressive method of producing a uniformly coated fibrous sheet suitable for printing purposes, which comprises the following steps: forming a continuous wet fibrous web, drying said web under elevated temperature, bringing said web into contact with a moving surface carrying a uniformly distributed film of coating material previously transferred to said moving surface through a plurality of contacting moving surfaces whereby the film is pre-worked and substantially dehydrated, transferring said material as a continuous finished coating to said web under pressure and drying said coated web, the concentrated condition of the pre-worked film being such as not to detrimentally affect the web.

"3. A continuous progressive method of producing a uniformly coated fibrous sheet suitable for printing purposes, which comprises the following steps: forming a continuous wet fibrous web, drying said web under elevated temperature, treating a coating mixture, comprising a coating substance and a carrier, to eliminate a sufficient portion of the carrier to render the mixture suitable for coating the fibrous web without detrimentally affecting the web, while simultaneously reducing the mixture to a desirable physical condition to smoothly coat the web thereafter coating the web with said reduced mixture and subsequently and without further working of the coating drying the coated web.

"5. A continuous progressive method of producing a uniformly coated fibrous sheet suitable for printing purposes, which comprises the following steps: forming a continuous wet fibrous web, drying said web under elevated temperature, passing said web between opposed rotating surfaces carrying preformed films of uniform thickness in which the coating material is uniformly distributed, transferring said preformed films simultaneously to opposite sur-

faces of said continuously advancing web under the pressure of said opposed rotating surfaces as finished coatings the said pre-worked films being substantially dehydrated whereby there is insufficient water to detrimentally streak and affect the web.

"6. The method of making coated paper suitable for printing purposes, which comprises the steps of treating the coating material to increase its viscosity by eliminating substantial quantities of its liquid content and render it relatively plastic, advancing a web of fibrous material and transferring the treated material as a viscous and smooth film to the entire surface of the web under pressure whereby to obtain a final coated product suitable for printing purposes.

"7. The process of making coated paper for printing purposes, which comprises continuously advancing a web of paper, subjecting a coating mixture to mechanical working action to smooth it and eliminate portions of the liquid contained therein and transferring said mixture as a mechanical pre-worked film to the advancing web under pressure, the liquid content of the film being insufficient to detrimentally streak the web upon which it is transferred.

"8. The process of making coated paper suitable for printing purposes, which comprises the steps of treating a coating mixture, comprises a coating substance and a liquid carrier, to eliminate a sufficient portion of the carrier to render the mixture suitable for coating the paper without streaking the same while simultaneously reducing the mixture to a desirable physical condition to smoothly coat the paper, advancing a web of paper continuously and depositing said mixture upon the surface of the advancing web as a smooth finished coating therefor."

In their brief, the plaintiffs state with exactness what they consider the Massey patent to show. They say, " * * * we stated exactly what we consider the Massey patent to show. This was set forth in the form of three steps:

"1. Preforming a measured uniform film of an aqueous coating composition by passing the coating composition between the nip of two rollers moving in the same direction, each of which is wetted by the composition, and each of which carries a film thereon.

"2. Passing this film to and into contact with the paper, between two rolls pressing it on the paper.

"3. Having the film at the point of application to the paper so dehydrated (low in water) that while the film is pliable and workable at the applying nip, the absorption of water from the film into the paper at that point is such as to set up the film at once on the surface of the paper, so that it will not flow thereafter and thus retains the uniform thickness given it at the applying nip. The coating thus cannot flow and detrimentally streak the web, and it does not need working. It could not be brushed."

█ The defendant denies that this is a fair summary of what the patent discloses. It agrees that this does describe the process that takes place on the machines of both the plaintiff and defendant and that the correct immobilization principle is embodied in the absorption of water by the sheet of paper at the nip; but the defendant states that infringement cannot be proved by comparing defendant's practices with those of Consolidated. To determine whether there has been infringement, the defendant's practices must be compared with those set forth in the claims of the patent in suit. If the defendant's practices do not come within those claims, it is immaterial that similarity may be found in the commercial operations of the parties to the suit, and even if the defendant had made an identical copy of the Consolidated machines, that would not help the plaintiffs to prove infringement. It is the claims of the patent which are the measure of the patentee's protection. It is the position of the defendant that the claims must be read in the light of the specifications and the file wrapper and when so read, all of the claims of the patent in suit must necessarily be held limited to a process in which a multiplicity of distributing rolls,

including oscillating rolls, is employed on the coating machine to eliminate substantial quantities of water from the coating mixture prior to its application to the paper, so as to produce a smooth, uniform, concentrated, finished film prior to application to the paper so that no further smoothing treatment is required.

We are minded to accept the defendant's version of what the patent discloses.

It is the defendant's position that the claims as so interpreted do not cover the defendant's process for two reasons. In the first place, in the defendant's process there is no proof that any significant quantity of water is eliminated by the use of the rolls in the coating machine, and in the second place, there is no proof that the coating mixture on the applicator roll of any of defendant's machines is in the form of a smooth, uniform, finished film.

Plaintiffs admit there is no appreciable amount of evaporation of water from the coating mixture as it passes over the rolls of defendant's machines but they do contend that defendant infringes because it employs an equivalent device in the form of a dispersing fluid.

Defendant in its process uses a concentrated coating composition from which the elimination or omission of water has been made possible by various means including the addition of a dispersing agent *before* delivery of the composition to the coating machine. A dispersing agent is a chemical which when added in a very small amount to coating compositions will greatly increase their fluidity. These dispersing agents were well known in the art prior to Massey, and the addition of a small fraction of such a material permits the elimination or omission of a very considerable amount of water while arriving at the same ultimate fluidity. Plaintiffs argue that this is, in fact, equivalent to the process set forth in the invention, that the process is in no wise altered if some of the water is left out or eliminated before delivery to the coating machine, that there is nothing in the claims to indicate an intention to limit them to elimination of the water on a series of rolls, and that defendant seeks to limit the words of the claims so that they will not cover process steps fairly within their own language.

Plaintiffs suggest that defendant eliminates water by making up a coating mixture, having sufficient fluidity to wet the roll and form a proper coating on the applicator roll, without the necessity of evaporating any substantial amount of water on the rolls of the coating machine, that is, that defendant eliminates water by not adding as much to its coating formula in the first place, and adding, instead, a dispersing agent which maintains the fluidity of the coating. They say there is no doubt that defendant subjects its coating mixture to some mechanical working action, that this working action eliminates some portions of the liquid which would otherwise be required for fluidity, and that the portion eliminated is significant enough to bring the defendant's process within the scope of the patent. In addition, plaintiffs contend there is infringement under the doctrine of equivalence, in that elimination of portions of water is made possible by adding a dispersing agent to it and mixing it in by mechanical working action. It is contended that under the broad interpretation which is claimed by them, this is equivalent to the process described by the patent and therefore infringes the patented process.

Plaintiffs contend that under doctrines laid down by the Supreme Court and our own Court of Appeals, an inventor who has created a new industry is entitled not only to the broadest interpretation of the words he uses, but even to cover processes which literally would fall completely outside the language of the claims. They rely on such cases as Tilghman v. Proctor, 102 U.S. 707, 26 L.Ed. 279; Colgate-Palmolive-Peet Co. v. Lever Bros. Co., 7 Cir., 90 F.2d 178; General Electric Co. v. Hoskins Mfg. Co., 7 Cir., 224 F. 464.

In claiming the benefit of this doctrine, they point to great commercial success and the award of a gold medal to Mr. Massey in 1947 in recognition of his efforts in this field. They argue that the Massey invention is one of the greatest advances ever made in its field, and that, as such, it is entitled to the broadest possible construction and interpretation. Under this theory, they

say, he is entitled not only to what he has invented and what he claims within the literal language of his words, but also to all processes which are the functional equivalent thereof.

The court believes that the patent is not entitled to the broad interpretation asked for by the plaintiffs for reasons which will be set forth later. In any event, the court believes that under the doctrine of file wrapper estoppel, the plaintiffs are limited to the literal wording of the patent claims and are not now entitled to the broad interpretation which they seek.

An examination of the file wrapper seems to us to bear out the defendant's argument that it was only by reason of the assertion of Massey that the claims were limited to the idea of evaporation of substantial quantities of water by means of mechanical working in a multiplicity of transfer and oscillating rolls in the coating machine that the Examiner was finally induced to allow all of the claims.

Plaintiff Massey filed his application for the patent in suit on May 29, 1930. On January 31, 1931, the Patent Office Examiner rejected the claims as being devoid of invention over the prior art. In an amended application filed June 29, 1931, Massey says, referring to the old brush coating method,

"In coating paper by the method heretofore proposed, the paper is substantially saturated by the liquid carrier of the coating substance. This is not done intentionally but is an inherent characteristic of the coating processes heretofore used. The coating material must be applied in this manner to insure sufficient fluidity for subsequent working by brushes, doctor rolls or doctor blades."

He then goes on to say, relative to his machine process,

" * * * Applicant has found that by pre-working the film of coating material prior to applying the same to the coating rolls, a uniform film of coating material may be applied having a low percentage of liquid carrier."

It would fairly seem then that the substance of Massey's argument is that by *pre-work-ing* the coating mixture in the transfer rolls before it gets to the applicator nip, the moisture content is reduced to a minimum.

On January 23, 1932, the Examiner after specifically rejecting each of the twelve claims, stated,

"All of the claims are also rejected as lacking invention. Colbert shows the steps of drying, applying coating by means of a roll, and then drying again. Wheelwright shows the application of coating to both sides of the web as it comes from the paper machine and then drying the coated web. Morrow and Thompson show both sides of a web being coated by a series of rolls which work the coating material. The limitation that the film is pre-worked finds response in any of the references, both in the fact that the coating material is worked before it is put in the receptacles and in the fact that the very act of picking up and applying the coating by the rolls will work the film. In Colbert, Thompson and Morrow the transfer rolls additionally work the film. Brueshaber of record shows the applicant's specific means for working a coating material and it may be used without invention, if it is desired to give the film an additional working, over that given in the other references. The applicant has merely combined elements all of which are old in the art and which have been used in similar combinations, without producing more than the aggregate of old results, Powers-Kennedy v. Storrie, 402 O.G. 519."

In a second amendment, filed July 14, 1932, many of the claims were amended by inserting the words "finished coating" in place of the word "film". Massey went on to say,

"The Examiner's contention that applicant has merely combined elements all of which are old in the art and which have been used in similar combinations without producing more than the aggregate of old results, does not seem to be sound or borne out in fact. Applicant's process broadly contemplates pre-working coating material

and applying the same by means of rolls to a web of paper from a paper making machine as a finished coating necessitating no further smoothing, scraping or brushing.

"Colbert applies coating to the web with a brush and completes the coating operation subsequent to the initial application of the coating material. Colbert does not pre-work the material since the subsequent brushing renders pre-working unnecessary.

"Morrow applies coating to the web by means of rolls and subsequent to said application brushes the coating upon the web. Pre-working of the coating material is unnecessary since the same is subsequently brushed. In fact, the Morrow patent is directed to a specific apparatus for brushing the coating after its application to the web. Morrow applies a coating material to both sides of the web in an unfinished state but does not make the application simultaneously, the application being made in series.

"Thompson does not pre-work the coating material because application is made, not to the raw paper, but to paper already coated. Thompson does not coat both sides of the web simultaneously but carries on a series operation. Sparks does not coat paper and contemplates further operations other than drying after application of the oil. Pre-working of the oil is unnecessary and not contemplated. Wheelwright does not coat paper nor does the patentee contemplate pre-working. The disclosure points out that the invention is a specific method of sizing and can only be used with a specific sizing substance.

"No possible combination of the above patents shows the step of producing a finished coating upon a paper web without subsequent operations other than drying, nor do any of the references contemplate pre-working of the coating material. * * *"

Following this there was a personal interview between the Examiner and Massey,

the Vice President of the Seamen Paper Company of Chicago, and by his attorney. A third amendment was then submitted in which, after cancelling certain claims and amending others, new claims were added as follows:

"13. The method of making coated paper suitable for printing purposes, which comprises the steps of first preparing a relatively concentrated, plastic, continuous coating film by mechanically working the same, advancing a web of fibrous material to be coated and transferring said coating film in its pre-worked smooth condition to said web under pressure.

"14. The method of making coated paper suitable for printing purposes, which comprises bringing the web into contact with moving surfaces carrying uniformly distributed films of coating material, substantially dehydrated and plastic, whereby to prevent streaking upon the web, and simultaneously transferring said material as a pre-worked continuous smooth film to each side of the web under pressure.

"15. The method of making coated paper suitable for printing purpose, which comprises bringing said web into contact with a moving surface carrying a uniformly distributed film of viscous coating material, previously transferred to said moving surface through a plurality of contacting moving surfaces whereby to pre-work the coating material and increase its viscosity and transfer said material as a continuous smooth film to said web under pressure.

"16. The method of making coated paper suitable for printing purposes, which comprises the steps of treating the coating material to increase its viscosity by eliminating substantial quantities of its liquid content and render it relatively plastic, advancing a web of fibrous material and transferring the viscous and smooth film thus treated to the entire surface of the web under pressure whereby to obtain a final coated product suitable for printing purposes.

"17. The process of making coated paper for printed purposes, which comprises continuously advancing a web of paper, subjecting a coating mixture to mechanical working action to smooth it and eliminate portions of the liquid contained therein and transferring said mixture as a mechanical pre-worked film to the advancing web under pressure, the liquid content of the film being insufficient to detrimentally streak the web upon which it is transferred.

"18. The process of making coated paper suitable for printing purposes, which comprises the steps of treating a coating mixture, comprises a coating substance and a liquid carrier, to eliminate a sufficient portion of the carrier to render the mixture suitable for coating the paper without streaking the same while simultaneously reducing the mixture to a desirable physical condition to smoothly coat the paper, advancing a web of paper continuously and depositing said mixture upon the surface of the advancing web as a smooth finished coating therefor.

"19. A continuous process of making coated paper suitable for printing purposes, which comprises the following steps: depositing a mixture comprising coating material and a liquid carrier upon a moving surface, the viscosity of said mixture being below that desired for coating, transferring said mixture to a second moving surface, working said mixture to cause it to spread and form a uniform film on said second moving surface while simultaneously increasing the viscosity of the mixture, continuing such treatment until the mixture has reached a viscosity such as will not detrimentally streak or affect the web and is in the form of a uniform film and then transferring said uniform film to a web of paper and simultaneously compacting the film thereon.

"20. A continuous process of making coating paper suitable for printing purposes, which comprises the steps of depositing a mixture including coating material, a liquid carrier upon a rotating surface, the viscosity of said mixture being below that desired for coating, transferring said mixture to a second rotating surface, working said mixture to cause it to spread and form a uniform film of said second rotating surface while simultaneously increasing the viscosity of the mixture, continuing such treatment until the mixture has reached the desired viscosity such as will not detrimentally affect the web, and is in the form of a uniform film, transferring said uniform film in its viscous state to a web of paper simultaneously compacting the same thereon, in the form of an unbroken, smooth coating, the viscous condition of the film minimizing the drying action required for the coated product.

"21. The herein described process for making coated paper for printing purposes, the steps which comprise, advancing a web of fibrous material, subjecting a coating mixture to treatment during the advancing of the web for the purpose of eliminating substantial quantities of water content thereof, thereby mechanically working the mixture and in thereafter continuously transferring the viscous coating in the form of a pre-worked, smoothed, finished coating to the surface of the advancing web whereby to produce a final product with a smooth mechanically worked coating film thereon substantially free of streaks or other imperfections."

Claims 16, 17, 18, 19, 20 and 21 with a few minor changes made later were finally adopted as claims 6, 7, 8, 9, 10 and 11 of the patent.

In the argument accompanying this third amendment, the following statements were made:

"This invention is addressed particularly to the problems of preparing coated paper suitable for printing purposes. As suggested during the interview the claims have been so worded by the present amendment.

"In that art the practice heretofore was to apply the coating mixture of low viscosity and high liquid content to a web and thereafter smooth the mixture on the web by brushing or scraping the same. The high water content present inevitably streaked the web and in order to smooth it the mixture had to have sufficient fluid therein to permit the smoothing or working of the material on the web. Substantial drying action was required. As discerned by the Examiner this invention relates to the steps of taking the mixture of low viscosity and repeatedly working it mechanically by the oscillation of rotating rolls for the purpose of obtaining a final coating film which is pre-worked and of high viscosity *before* the same is transferred to the web. This eliminates streaking of the web and any subsequent treatment such as smoothing or scraping after the coating mixture has been applied to the web.

"The claims have *all* been amended to sharply define this advance. The art has thoroughly been discussed in the previous arguments contained both in this case and in Serial No. 450,610, and it would serve no purpose to repeat the discussions of the prior references herein. It is sufficient to say that none of them 'pre-work' the mixture and that *the claims are all committed to this thought* and the utility thereof in the printing art." (Court added emphasis in last par. only)

On February 20, 1933, the Examiner again rejected the claims. Following this, Massey had a second personal interview with the Examiner, and subsequently a fourth amendment was filed on June 28, 1933. In that amendment, the following argument was made:

"* * * Applicant's problem, however, was to apply a coating solution having an undesirable quantity of fluids therein to the paper without injury thereto and without necessitating the use of brushes or the like to smooth it in place. Consequently, *his avowed purpose was to take this coating solu-*

*tion and to so mechanically treat it, through a succession of zones, to eliminate undesirable proportions of the fluid therefrom and thereby increase its viscosity or dehydrate it sufficiently so that when the smooth pre-worked and preformed film is applied to the paper* there will be no danger of discoloring or impairing the paper and there will be no necessity, furthermore, of subsequently treating the coating material after it has been applied to the paper.

"This is entirely new as far as the prior art is concerned. There is no elimination of water in Thompson, as he was merely concerned with a transfer scheme.

"Brueshaber had an entirely dissimilar problem as he was merely applying ink. There was no purpose in reducing the viscosity of the ink so that it would not hurt the paper; on the other hand, he was merely applying ink to the type.

"The *concept* and results of applying applicant's material and *preworking it mechanically to eliminate undesirable proportions of fluids* is entirely different from Fisher, who merely shows the idea of applying rubber to a cloth web. The same is true with Lowry. Each of these patents represents a far cry from the applicant's invention as was conceded during the interview. * * *" (Court added emphasis.)

It was only at this point that any of the claims were allowed.

 When an applicant for a patent limits his claims in the course of prosecution of the patent and explains such limitation, he is bound by such limitation and explanation and may not later expand his claims except in accordance with the file wrapper.

In the case of Exhibit Supply Co. v. Ace Patents Corp., 1941, 315 U.S. 126, 62 S.Ct. 513, 519, 86 L.Ed. 736, the court said:

"* * * The difference which he thus disclaimed must be regarded as material, and since the amendment operates as a disclaimer of that difference it must be strictly construed

against him. Smith v. Magic City Kennel Club, supra, 282 U.S. [784] page 790, 51 S.Ct. [291] page 293, 75 L.Ed. 707; Shepard v. Carrigan, 116 U.S. 593, 598, 6 S.Ct. 493, 495, 29 L.Ed. 723; Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 228, 26 L.Ed. 149. As the question is one of construction of the claim it is immaterial whether the examiner was right or wrong in rejecting the claim as filed. Hubbell v. United States, supra, 179 U.S. [77] page 83, 21 S.Ct. [24] page 26, 45 L.Ed. 95; I. T. S. Rubber Co. v. Essex Rubber Co., supra, 272 U.S. [429] page 443, 47 S.Ct. [136] page 141, 71 L.Ed. 335. It follows that what the patentee, by a strict construction of the claim, has disclaimed—conductors which are carried by the table but not embedded in it—cannot now be regained by recourse to the doctrine of equivalents, which at most operates, by liberal construction, to secure to the inventor the full benefits, not disclaimed, of the claims allowed."

See also Dixie Cup Co. v. Paper Container Manufacturing Co., 7 Cir., 1948, 169 F.2d 645.

Thus, the claims must be construed in the light of the representations made by the patentee to the Patent Office, and where, as here, the patentee has stated that "the claims are *all* committed to this thought" (emphasis added) of mechanically pre-working the coating mixture so as to eliminate substantial quantities of water content thereof and increase its viscosity, he is now limited by such representation.

Plaintiffs contend that the file wrapper history may be disregarded where the claims themselves are not amended by insertion of the limitations specified in the course of the arguments included in such file wrapper history. However, the effect of a patentee's arguments in the Patent Office in obtaining the allowance of his claims was considered at length in the case of Barrel Fitting & Seal Corp. of America v. American Flange & Mfg. Co., 1935, 74 F.2d 569, where the Court of Appeals for the Seventh Circuit had before it a patent

on a barrel fitting or closure. In discussing this question, Judge Evans said, 74 F.2d at page 570:

"The issue of infringement turns upon the construction of the claims in the light of the explanation which the applicant made to the Examiner in the Patent Office."

After describing the structure disclosed in the patent, and the specifically different structure which was used by the defendant, the court said:

"When applicant met with opposition in the Patent Office he sought to distinguish his invention from that shown by one Sleight who had obtained a patent on a somewhat similar structure."

The court then went on to say, 74 F.2d at page 571:

"The issue presented is one which frequently arises in patent suits. The claim as written may be technically infringed. To secure its allowance in the Patent Office, however, the applicant explained its true scope. By restricting its scope to the actual novelty which truly expressed the asserted discovery, the inventor secured the allowance of his claim. Later when the claim is involved in litigation the patentee argues for a more liberal construction of the language of the claim and ignores the refinements of distinction which he made in order to secure its allowance.

"The position of counsel is most natural and entirely proper. The inventor is entitled to as broad a construction of his claims as his invention warrants unless, of course, he has waived part of it by failing to claim it. Nor should he be unduly restricted by positions taken by his counsel in the Patent Office. Distinctions are made and limitations are sometimes placed on language of claims by applicant's counsel which are somewhat inaccurate or made to meet a precise prior art citation, and without much thought as to their effect on other structures designed to avoid infringement. We should therefore be careful and avoid

such construction of the claims as will defeat the real discovery which the inventor is contributing to the art.

"Applying the foregoing to the facts in the instant suit, we are satisfied that the claims in question would never have been allowed had the appellant asserted their scope to be that for which he now contends. They were allowed only upon his express statement of a limited scope which excluded plugs provided with the usual rubber sealing gasket between the bung and the bushing."

The court held in that case that the patentee had so restricted his claims that they were not capable of an interpretation which would include the defendant's structure.

In addition to the limitations arising out of the prosecution of the patent, the subsequent conduct of the plaintiffs with respect to their licensing agreements impels the inference that the plaintiffs themselves did not consider the claims of the patent to have the broad scope which they now seek. As pointed out earlier, they did not appear to place any special value upon the patent in suit in the licensing agreements in which it was included, but merely included it in a package deal along with other patents which they believed might cover the licensees' proposed operations. A comparison of the Dunn Sulphite and Crown-Zellerbach licenses would also indicate that they placed no value upon the patent.

Such a conclusion is further supported by the conduct of the plaintiffs toward defendant's operations. Although the plaintiffs now claim that this was one of the greatest inventions ever made in the industry, they showed no unusual concern or apprehensiveness either in January, 1940 when they learned that the defendant was going to rebuild a paper machine "to make an improved type of direct coated paper", or later, in December of that year, when they obtained samples of the new papers and had analyses made. It was not until six years later that a notice of infringement was sent to the defendant. We find such conduct inconsistent with their present assertion that the process described in the patent in suit revolutionized the industry.

█ It is the opinion of this court that as a consequence of the representations made to the Patent Office in order to secure allowance of the patent, the patentee is now limited to a process in which a multiplicity of distributing rolls, including oscillating rolls, is employed on the coating mixture prior to its application to the paper for the purpose of eliminating a large proportion of the liquid content of such coating mixture and for the further purpose of producing a smooth, uniform, concentrated film of such mixture on the applicating rolls, and that there is no showing that any significant quantity of water is eliminated by the use of rolls in the defendant's coating machine. Consequently, the court finds there is no infringement.

Defendant makes the additional argument that there is no infringement because the defendant does not obtain on its applicator rolls the smooth finished film stressed by the plaintiffs. The court does not believe there is any merit in this argument. The testimony shows that the film on the applicator rolls of both plaintiffs' and defendant's machines is not perfectly smooth but is in the form of a pattern of ridges, and that the smoothness varies according to the weight of the coating. The film appears smooth to the naked eye when the coat weight is light and appears increasingly uneven as the weight of the coating is increased. However, the court believes that the film was sufficiently smooth for the purpose for which it was intended. It is not and does not need to be perfectly smooth.

██ Even though the patent has expired and this court has found that there was no infringement of the patent by the defendant, thereby disposing of the present suit, the court believes that it should also go into the question of the validity of the patent. Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644.

In order to constitute an invention, the patent must disclose and claim something that is both new and useful. If the thing

taught is new but of no value to the public, the patent must be held invalid. Similarly, if the patent teaches something that is useful but the thing taught and claimed is not new, the patent must be held invalid. The patent is presumed to be valid, however, until such presumption has been overcome by convincing evidence, and the burden of proof to show invalidity is upon the defendant. ˙ Radio Corporation of America v. Radio Engineering Laboratories, 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163.

Plaintiffs have stated, as set forth previously, exactly what they consider the patent to show:

"1. Preforming a measured uniform film of an aqueous coating composition by passing the coating composition between the nip of two rollers moving in the same direction, each of which is wetted by the composition, and each of which carries a film thereon.

"2. Passing this film to and into contact with the paper, between two rolls pressing it on the paper.

"3. Having the film at the point of application to the paper so dehydrated (low in water) that while the film is pliable and workable at the applying nip, the absorption of water from the film into the paper at that point is such as to set up the film at once on the surface of the paper, so that it will not flow thereafter and thus retains the uniform thickness given it at the applying nip. The coating thus cannot flow and detrimentally streak the web, and it does not need working. It could not be brushed."

We think it will be helpful to examine this position, notwithstanding our finding that this is descriptive not of the patent in suit but of the operations of the parties.

The first two steps claimed by the plaintiffs appear to be nothing more than a description of the process occurring in the inking mechanism of a printing press. The use of an offset printing press to apply a coating in the same way in which coatings had been applied before on the same press, the only change being the extension of the coating to cover the entire area of the paper, is not a novel concept. The idea of coating paper continuously as an on-the-machine process also did not originate with Massey. The Wheelwright patent, No. 1,195,888 of 1916, shows an on-the-machine device; and, in fact, defendant's G–K method of machine coating is not charged to infringe the patent in suit. Nor was the idea of coating both sides of the paper simultaneously a novel one. The Wheelwright patent, No. 1,195,888, the Traquair patent, No. 1,518,371 of 1924, and the Davidson and Gorges patent, No. 890,221 of 1908, all disclosed the idea of coating both sides of the paper simultaneously.

The evidence has shown that there is no efficacy in the theory of evaporation of water on the rolls between the metering nip and the application nip. Whatever evaporation occurs is slight and of no great significance. Defendant's Wilkinson testified that in the defendant's process there is no advantage in reducing the moisture content of the coating mixture between the pond and the application nip, and that as far as he knew, the solids content of the mixture was the same at the applicator nip at it was in the metering nip or pond. Dickerman stated that in the Consolidated machines, the increase in solids content between the pool and the applicator nip is about one percent. However, he also stated that in their regular operations, the solids content of the mixture was subject to a two percent variation. Plaintiffs have admitted that the amount of evaporation of water as it passes over the rolls is not appreciable. Consequently, the court believes that whatever amount of evaporation occurs on the rolls of the coating devices of either plaintiffs or defendant is of no functional significance or utility.

On the question of whether the defendant obtains a smooth film of coating material on its applicator rolls, the court has previously held that it was sufficiently smooth for the purposes required. However, the obtaining of a smooth coating film by a system of transferring rollers is no different than the printing press inking device with which Massey started and does not appear to this court to constitute invention. Many of the prior patents cited in the record have

systems of rolls which distribute a coating in such a way as to obtain a smooth film on an applicator roll.

The third step set forth by the plaintiffs actually represents the true principle of operation of machine coating. However, nowhere in the patent is this correct immobilization principle, that is, the absorption of water by the paper web, set forth. Then, too, the plaintiffs have minimized the importance of the formula even though the testimony bearing on the machine operations of both parties brings out most clearly the great importance of the coating mixture formula, if success is to be attained. Thus, in addition to the patent's failure to disclose the correct immobilization principle of absorption of water by the sheet of paper at the nip, it also fails to provide any coating formula other than a list of materials, some of which would be usable and some of which might not be usable. In the specification, the patent says it "may comprise a solution or suspension of suitable coating substances such as, for example, size, glue, gelatin, casein, starch, clay, calcium sulphate, resin, oils and/or varnishes carried and/or dissolved in a vehicle and/or diluent of water or oil." Apparently, it was sought to include any and all formulas usable for conditioning paper for printing. Furthermore, the patent fails to make any mention of a dispersing agent. In any event, the use of dispersing agents has been common practice long before the patent in suit, and Massey himself used a dispersing agent in his Columbian formula although he made no mention of it in his patent.

Plaintiffs' charge of infringement is predicated upon the use by defendant of a single volume control roll applied to the non-accused G–K coaters. Such a metering roll was not new with Massey—it had been taught by Davidson and Gorges, Sommer, Pohl and Wheelwright.

Had the patent included the correct immobilization principle as set out above, it is unlikely that the patent would have been granted in view of the fact that this principle was very accurately described by Traquair in his Patent No. 1,518,371, of December 9, 1924, prior to the patent in suit. In that patent, Traquair stated that he used a high solids content solution for coating paper (approximately ⅓ water and ⅔ pigment), and that—

"* * * Passing between the rolls the pigment is pressed down on the paper, filling the inequalities and forming a fine smooth surface. A sufficient quantity of the water is absorbed by the paper before it passes from between the rolls that the coating is rendered immobile; that is, set or fixed so it can no longer flow. The smooth surface formed by the rolls is therefore retained and thus I eliminate the brushing which has heretofore been an important part of all coating methods."

It further appears that considering that this is a process patent, the Wickel British Patent No. 9272 of 1910 gave a better description of the process as plaintiffs now claim it and a better description of the nature of the formula. So far as the apparatus is concerned, Wickel gives general but adequate directions to the effect:

"* * * The multiple roller transferring apparatus may be copied in principle from the inking rollers used on rotary printing machines. The rollers may be provided with either gelatine, leather or rubber coatings and may also alternate with metallic rollers. The transfer proper to the paper is effected by a smooth roller of not too small a circumference against which a somewhat larger roller bears with pressure. Of these two rollers, between which the paper is passed, the one should be elastic, the other rigid. * * *"

In his patent, Wickel gave an adequate description of his formula and the ingredients for making a suitable coating mixture, whereas Massey is general and vague. On the important point of moisture content, for instance, Wickel gives a much better explanation than Massey:

"In the present instance the colour composition is prepared in the form of a paste containing very little water but of great adhesiveness which is given such a viscosity by suitable additions, that it may be transferred to the paper by means of a multiple roller apparatus in the same manner as varnish printing ink. On the paper such colour

will, owing to its small content of water, dry almost immediately when slightly heated and thus, practically, at the very moment of its transfer, will form a well adhering, then, but well covering coating, and will not allow either opportunity or time for the detrimental effects described to be produced in the paper. For the same reason the latter may travel at a speed which is higher than that which must be employed when operating with a liquid colour mixture, as required by other coating methods and may be increased the less water the colour paste contains."

As heretofore stated, the court cannot accept the plaintiffs' three-step summary of what they believe the patent discloses. In our judgment, the patent taught a process in which a multiplicity of distributing rolls, including oscillating rolls, is employed on the coating mixture prior to its application to the paper for the purpose of eliminating a large proportion of the liquid content of such coating mixture and for the further purpose of producing a smooth, uniform, concentrated film of such mixture on the applicating rolls. That the plaintiffs were completely bound to the printing press idea is shown by the fact that the patent itself disclosed a nest of 13 rolls, in addition to the applicator roll, for each side of the paper web, or a total of 26 such rolls, and the first machine to be installed at Consolidated had, in addition to the applicator rolls, 12 rolls on one side of the paper and 11 rolls on the other. The accused machines of the defendant, in addition to the applicator rolls, have only a metering roll or a metering roll with a back-up roll on each side of the paper. In view of the tremendous cost of construction of these machines, it is inconceivable that plaintiffs would have built so many rolls into them unless they were convinced that this was the essence of their invention. Their faith in the efficacy of the multiple roll action appears to have diminished as time and experimentation went on, with more and more rolls being discarded. Plaintiffs' present arrangement consists of 9 rolls in addition to the applicator rolls, 5 on one side of the paper and 4 on the other, and it is conceded that this number could be reduced further by increasing the pressure between the rolls so that the area of the nip is enlarged, one of the rolls being resilient.

What we have labored to express in this opinion has been put quite simply and clearly in the following excerpt from an article by Mr. Dickerman, Consolidated's plant manager, in the December 31, 1938 issue of the Paper Mill & Wood Pulp News. He stated (page 17):

> "Mr. Massey simply took the basic principle of offset printing, substituted an aqueous mix for the ink, and applied it to the coating of paper."

Plaintiffs have stated that their commercial success was enormous, that the process they use has revolutionized the industry, and, in fact, has created an entirely new industry. There is no doubt whatever of the commercial success of Consolidated's operations. However, we hold that neither the Consolidated nor Kimberly-Clark operations follow what we have found to be the teaching of the patent.

In view of the prior art as disclosed by the defendant, we fail to find invention over that prior art.

In anticipation of the inevitable question of why was it not done before if the prior art was all there, we suggest that this is one of those situations the Seventh Circuit Court of Appeals had in mind when it said:

> "Members of the patent bar frequently refer in a scornful or derisive way to a *paper patent*. It is hardly fair or just to do so. In many cases the inventor may not be in the necessary financial position to make the patented article and he may be unable to persuade its adoption by manufacturers who would have to replace their plant machinery and equipment in order to follow the teachings of the new patent. Nevertheless the discovery may well be patentable." Coltman v. Colgate-Palmolive-Peet Co., 7 Cir., 1939, 104 F.2d 508, 511.

It is difficult for the court to conceive of an industry where opportunity for experi-

mentation would be so costly and difficult. Huge plants may contain only three or four machines, each of which extend almost the length of the building and operate as continuous integrated units wherein a watery solution is introduced at one end and the finished product is rolled up at the other end. One machine will cost a million or more, and voluntary or involuntary shutdown of a machine is a costly matter.

Massey, himself, invested $150,000 of his own money in the effort. This was done in the depression years when money's real value was much greater than today. But while this took courage and enterprise of a very high degree, we must hold that the result did not constitute invention.

During the course of the trial defendant attempted to introduce evidence by means of a machine model. Plaintiffs objected to the introduction of this evidence on the ground that the model was misleading and without value as evidence. At the time, the court received such evidence subject to the objection. The court now rules that the objection is sustained and has disregarded such evidence in reaching its decision.

In our memorandum decision of May 29, 1952, we ordered the exchange and submission of proposed findings of fact and conclusions of law within thirty days from the filing of this opinion. The court believes that unless persuasive reasons to the contrary can be shown, the findings of fact and conclusions of law as set forth in this opinion are sufficient. Counsel for the defendant shall prepare an order in conformity with this opinion.